IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD GLEN WILLIAMS,

    Petitioner,                      No. 2:10-cv-2088 JFM P

    vs.

CALIFORNIA DEPARTMENT OF CORRECTIONS,                       ORDER AND

    Respondent.                 FINDINGS AND RECOMMENDATIONS

                                                 /

          Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a 2007 judgment of conviction entered against him in the Nevada County Superior Court on charges of first degree murder with special circumstances and a weapon enhancement. Petitioner claims that his constitutional rights were violated by the ineffective assistance provided him by his trial counsel and as a result of jury instruction error at his trial. Petitioner also claims that the lying-in-wait special circumstance applied in his case is unconstitutionally vague.

/////

/////

/////

/////

1

FACTS[1]

[Petitioner] admitted that on October 22, 2005, he killed his wife of nearly 30 years, Hendrika "Hetty" Williams. The defense was that he acted in a dreamlike, unconscious, state caused by withdrawal from the drug Paxil. The People argued the planning and execution of the killing, and [petitioner]'s clear memory of what he did, showed that he was conscious.

A year or two before the events in question [petitioner] tried to kill himself after Hetty said she wanted a divorce. He saw a psychiatrist and was prescribed Paxil, which he took for several months and which he characterized as a lifesaver.

In 2005, Hetty wanted a divorce, but wanted to wait until their youngest daughter, Briana, finished high school the next year.[2]

Hetty met Steven Burns, and became romantically involved with him after she filed for separation in July. Hetty moved into the downstairs unit of the family home, although later she switched with [petitioner] and lived upstairs.

In late July or early August, [petitioner] saw a psychiatrist again and was again prescribed Paxil.

On September 25, Jackie Webber, a longtime family friend who had helped Hetty move into the downstairs unit, was speaking with Hetty by telephone and heard [petitioner] begin screaming. [Petitioner] overheard the conversation and learned that Hetty was seeing Burns, and Webber testified she heard [petitioner] say "Hetty, I'm going to kill you." However, Webber conceded she had not reported this threat until just before trial. Briana testified [petitioner] was screaming and swearing during this incident, saying "things like 'you fucking bitch' and 'you fucking liar' at my mom."

Hetty obtained a restraining order against [petitioner] at about this time.

[Petitioner] called Burns and told him not to see Hetty, and complained to Burns' mother and employer about what Burns was doing.

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Williams, No. C057856 (Nov. 23, 2009), a copy of which is attached to respondent's answer to the petition (Doc. No. 13, Ex. A), filed January 27, 2011, and is included in the record before this court as Lodged Document No. 1.

[2] Further unspecified dates are to 2005.

In October, [petitioner]'s psychiatrist increased his Paxil dosage, but [petitioner] testified he thereafter stopped taking the drug, because he was feeling better.

In October, Hetty developed a poison oak rash on her torso and genitals. [Petitioner] had spread poison oak on her sheets and underwear and told a former neighbor, "he was real tickled about that." "He was giggling. He knew it was wrong, but he thought it was just great." [Petitioner] testified that he did this. Hetty then moved into a separate house.

On October 17, the night before a family court hearing, Burns stayed over at Hetty's house. That night, [petitioner] spray painted Burns' truck. He also searched eBay for stun guns.

[Petitioner] had been planning to go kayaking with Hetty, and he became angry when she cancelled and went to Lake Tahoe with Burns.

On October 21, [petitioner] helped his mother by climbing on her roof to clear her gutters. Hetty's sister-in-law, Ena Heynen, spoke on the telephone with [petitioner] that day and he generally sounded upbeat, "jovial, if not euphoric," but there was "hidden darkness" in the call and when he described using poison oak on Hetty, he thought it was funny, and spoke in a sadistic tone. [Petitioner] admitted that he was pleased when he described this event.

On the night of October 21, [petitioner] bought a stun gun on the Internet, although he testified he did not complete the last step necessary for the purchase. [Petitioner] slept badly that night and felt that he wanted to kill Hetty. He went to the garage and took the washers off some of the nails for his nail gun, cut up a towel to use as a ligature and told his dog that he was going to kill Hetty and himself. He testified he felt manic and was on "auto pilot."

When Hetty and Burns returned from Lake Tahoe, Burns spent that night (October 21) with her. Hetty was going to see [petitioner] the next day to discuss property issues, did not fear [petitioner], and declined Burns' offer to accompany her. When Burns left Hetty's house the next morning, he found a nail in one of his tires. [Petitioner] denied putting a nail in Burns' tire.

Briana, who had been away on a trip, called [petitioner] because he was supposed to pick her up that morning (October 22), but he told her he had arranged for her grandparents to do so.

Before Hetty arrived that morning, [petitioner] wrote a purported suicide note on his computer, and even corrected minor typographical errors. The note begins: "Dear Friends & family – I love you all so much – I cannot take the fact that my dear Hetty has

chosen to have an [adulterous] secret affair behind my back. I found out the hard way and was blamed for finding out." Later, it says: "Steve Burns will have blood on his hands for this for some time. Jackie Webber will [too], for coaching Hetty away from me and helping to hide all of it." Still later it says "I must go with my dear Hetty, to be [cremated] together as planned and spread in the Bear [V]alley off Highway 20. All my possessions are to be divided among my family, with Jon administering my tools." He also expresses love for his family, including Peter and Ena Reynen, and hoping his daughters will forgive him. In part [petitioner] states "I am of sound mind and body[.]"

[Petitioner] then disconnected all of the telephones and locked up the house.

Although [petitioner] testified he bought his nail gun a couple of months before, there was evidence he bought it days before. In any event, the gun uses .22 caliber blank cartridges to fire hardened nails into concrete. It must be manually reloaded for each shot, with the muzzle pressed down hard–with 35 pounds of pressure–to release a safety lock. The nails come with square collars or washers to prevent them from penetrating completely into the concrete. As stated, [petitioner] removed the washers from a number of nails, allowing them to penetrate further. [Petitioner] testified he did this in the garage and that he wanted to kill Hetty.

[Petitioner] testified he placed the nail gun in the bedroom, placed the towel in his pocket, locked the doors, wrote the suicide note, and killed Hetty, all while feeling "directed" by another person. He attacked Hetty by surprise, strangling her in the hallway for 30-40 second, then closed her nose for 15-20 seconds when she was on the floor. Then he got the nail gun and shot her in the head. He reloaded and shot her in the head again, then carried her to the bedroom, reloaded and shot her in the chest. He then shot himself in the chest, twice, tried to shoot himself in the head, then plugged in a telephone and called 911. He did not feel the nails in his chest.

The 911 call was received at 10:11 that morning. [Petitioner] calmly told the dispatcher, "There's been a shooting at 10655 Alta Street", and to come quickly.

Peace officers had to force their way in. They found [petitioner] and Hetty on the bed, with a nail gun by Hetty's hand. Hetty died at the hospital, and [petitioner] was in the hospital for just over a month.

Dr. Henrikson, the pathologist, described the tracks of the nails and the strangulation marks on Hetty's neck.

/////

[Petitioner] admitted that while he was in jail, he learned about the so-called "Paxil withdrawal" defense and received some written materials about it.

[Petitioner]'s mental expert, Dr. Stuart Shipko, is a psychiatrist with expertise in anxiety disorders and the effects of Paxil, an antidepressant, mood-altering drug of the selected serotonin reuptake inhibitor (SSRI) class, and he maintains a website about Paxil. Dr. Shipko formed his opinions in this case by reading police reports, reports by [petitioner]'s psychiatrist and Dr. Roeder, a psychologist, and by reading a transcript of [petitioner]'s initial trial testimony, but he had never met [petitioner]. Based on this material and his experience, Dr. Shipko testified the killing was "typical of Paxil induced violence." His record review showed that [petitioner] began taking Paxil on August 4, reduced the dosage on September 7, increased the dosage to 20 milligrams, a fairly high dose, on October 5, then [petitioner] stopped taking the drug around October 10-14. The fact [petitioner]'s dosage was increased, causing him to feel better, and then abruptly stopped, was "a very disastrous event," and the killing occurred at the "peak of the withdrawal delirium[.]"

Dr. Shipko testified [petitioner]'s behavior after the increased dosage on October 5 – such as using poison ivy against Hetty and spray painting Burns' truck – was "suggestive" of mania. He described four mechanisms that can be caused by Paxil that equate to unconsciousness: Akathisia, or extreme restlessness, emotional blunting, delirium, and a serious sleep disorder. Another drug [petitioner] took, Trazodone, might have increased these effects.

On cross examination, Dr. Shipko conceded that goal-directed actions, such as searching the internet for weapons, modifying the nails and drafting the suicide note, and clear subsequent memory were inconsistent with delirium. However, he testified [petitioner] may have filled in his memory gaps with after-acquired information. He conceded that [petitioner] had received written materials on the "Paxil withdrawal" defense before he was seen by Dr. Roeder. And Dr. Shipko admitted he could not *diagnose* a patient without seeing him. But Dr. Shipko still maintained that without Paxil, the killing would not have happened.

[Petitioner] then resumed his testimony. He recalled working on the nails, tearing the towel, the details of the killing and that he intended to kill Hetty. He was "numb" and "pretty flat" when he drafted the suicide note, but remembered making coffee that morning. He intended to kill Hetty and himself, but did not know why, ". . . I was almost directed." He did not know why he put the

/////

/////

nail gun by Hetty's hand.³ [Petitioner] claimed that at some point he became very agitated while driving and although he attributed this to Paxil, he was vague about the dates his dosage changed and then stopped.

    In rebuttal, the prosecution called Dr. Eric Raimo, another psychiatrist. Although he reviewed the same records that Dr. Shipko reviewed, Dr. Raimo also observed [petitioner]'s testimony in court, as well as Dr. Shipko's testimony. In his view, it was essential to interview a patient to rule out malingering. He testified Paxil does not cause unconsciousness. Further, a person who is unconscious does not remember details of what he did, and is incapable of step-by-step planning. None of the four diagnoses posited by Dr. Shipko were supported by the materials Dr. Raimo reviewed: Two-akathisia and emotional blunting – are not forms of unconsciousness, and although delirium and severe sleep disorder can be forms of unconsciousness, they would not permit step-by-step planning. Mania can be goal-directed, but there was no sign of mania in the documentation or testimony Dr. Raimo reviewed. [Petitioner]'s clear memory of events negated unconsciousness. Because [petitioner] took Paxil successfully in 2004, it was unlikely he would have a severe reaction to it in the future. Paxil played no role in the killing and [petitioner] was conscious.

Opinion (Doc. No. 13, Ex. A) at 2-10.

## ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

    An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See <u>Wilson v. Corcoran</u>, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000).

/////

---

³ The Attorney General states [petitioner] told a peace officer in the hospital that Hetty shot him. Such testimony was given outside the presence of the jury, and the trial court later excluded it from evidence.

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003); Early v. Packer, 537 U.S. 3, 7 (2002). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not

---

[4] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S.   ,   ,131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter,131 S. Ct. at 786-87.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim

1  on the merits in the absence of any indication or state-law procedural principles to the contrary."
2  Richter, 131 S. Ct. at 784-85.  This presumption may be overcome by a showing "there is reason to
3  think some other explanation for the state court's decision is more likely."  Id. at 785 (citing Ylst v.
4  Nunnemaker, 501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on a petitioner's
5  claims rejects some claims but does not expressly address a federal claim, a federal habeas court
6  must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v.
7  Williams, ___ U.S. ___, ___, 133 S. Ct. 1088, 1091 (2013).

8        Where the state court reaches a decision on the merits but provides no reasoning to
9  support its conclusion, a federal habeas court independently reviews the record to determine whether
10 habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson,
11 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the
12 constitutional issue, but rather, the only method by which we can determine whether a silent state
13 court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no reasoned decision
14 is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for
15 the state court to deny relief."  Richter, 131 S. Ct. at 784.

16       When it is clear, however, that a state court has not reached the merits of a
17 petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a
18 federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino,
19 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

20 II.  Petitioner's Claims
21    A.  Ineffective Assistance of Counsel
22       Petitioner's first claim is that he received ineffective assistance of counsel when
23 his trial attorney failed to object to trial testimony by the prosecution's expert witness that
24 petitioner was conscious during the commission of the crime.  Petitioner contends that the expert
25 "had no knowledge" and that this testimony "undermined" petitioner's main defense theory.
26 (Petition filed Aug. 5, 2010 (ECF No. 1) at 5.)  The last reasoned state court decision rejecting

this argument is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. In rejecting petitioner's argument the state appellate court stated as follows:

> A person who is unconscious by reason of involuntary intoxication – that is, not aware of what he or she is doing – has not committed a crime. (Pen. Code, § 25, subd. Four; see *People v. Chaffey* (1994) 25 Cal.App.4th 852, 855-856.) [Petitioner]'s theory was that he could not have anticipated the withdrawal reaction of abruptly stopping his Paxil medication, and he killed Hetty while unconscious due to that involuntary reaction.
>
> [Petitioner] contends that his trial attorney was incompetent because he failed to object to Dr. Raimo's testimony that [petitioner] was conscious when he killed Hetty. We conclude that although a tenable objection might have been made, it would not have diminished the thrust of Dr. Raimo's testimony and would merely have required him to rephrase his opinion in terms of a hypothetical. For this reason, trial counsel may have made a rational tactical decision to refrain from objecting, and the lack of an objection did not cause prejudice.
>
> The rules governing [petitioner]'s claim are as follows:
>
>> """[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof."' [Citation.]
>>
>> "'[T]he mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel.' [Citation.] If, as here, the record fails to show why counsel failed to object, the claim of ineffective assistance must be rejected on appeal unless counsel was asked for an explanation and failed to provide one or there can be no satisfactory explanation. [Citation] 'A reviewing court will not second-guess trial counsel's reasonable tactical decisions.'" (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 466-467.)
>
> Generally, a person's intent is shown by his or her actions: "'[C]ourts and juries every day pass upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary

human experience, mental condition may be inferred.'" (*United States v. Williams* (2008) 553 U.S. __, __ [170 L.Ed.2d 650, 671]; see *People v. Johnson* (1901) 131 Cal. 511, 514.) "The intent or intention is manifested by the circumstances connected with the offense." (Pen. Code, § 21, subd. (a).)

In the *unchallenged* portions of Dr. Raimo's testimony, Dr. Raimo gave the opinion that a person who executes step-by-step planning and has a clear memory of events is a conscious person.

[Petitioner]'s testimony shows that, in advance of the killing, [petitioner] knew he intended to kill Hetty, and was able to alter the nail-gun nails for deeper penetration, tear a towel into a ligature, lock the doors, unplug the telephones, and draft and make minor changes to a suicide note that explained his jealous motivation for killing Hetty, and made clear testamentary provisions. When Hetty arrived, he was able to surprise her, strangle her, shoot her with a nail gun three times – having to reload each time – then shoot himself with the gun two times, then plug in a telephone and speak to a 911 operator.

What [petitioner] challenges on appeal is Dr. Raimo's testimony about his conclusion: *Because* a person who can implement and recall a detailed plan is a conscious person, and *because* [petitioner] was able to implement and recall a detailed plan, *therefore* defendant was conscious when he killed Hetty.[5]

On appeal, [petitioner] contends that trial counsel should have objected to this testimony. We assume for purposes of this appeal that a tenable objection could have been made. An expert may not testify "as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (Pen. Code, § 29; see *People v. Smithey* (1999) 20 Cal.4th 936, 960-961.) Although the Attorney General appears to contest the point, we assume for purposes of this appeal that consciousness is a "mental state" as that term is used in Penal Code section 20. (See *People v. Boyes* (1983) 149 Cal.App.3d 812, 819-821

---

[5] In particular, Dr. Raimo testified that, in his opinion, "Mr. Williams was not unconscious the night of the murder, save for as he testified the two hours he was asleep . . . . So with regard to the actual act, acts that led up to the killing and the like, it in my opinion was a fully conscious act. And Paxil had no effect on consciousness in this regard." He later testified: "I believe he was fully conscious, aware, actually reported that he wanted to kill his wife. Even though he didn't know why, he actually remembered that he wanted to do it. And in my opinion that's consistent with being conscious, awake, alert. He dated the suicide note. Wrote his name down on it. He's alert to person, time, made phone calls, told his parents to go pick up his daughter and the like."

[although consciousness is not an element of a crime, "it is pertinent both to the voluntariness of a defendant's acts and to his capacity to understand and intend those acts and their consequences"]; *Jackson v. Calderon* (9th Cir. 2000) 211 F.3d 1148, 1156-1160 [suggesting trial counsel could rationally conclude Penal Code section 29 would bar direct testimony about unconsciousness].)[6]

But the fact a good objection is available does not mean it is incompetent to refrain from interposing it. (See generally, *People v. Eckstrom* (1974) 43 Cal.App.3d 996, 1000-1003.)

As explained above, Dr. Raimo gave his opinion that a person who carried out a detailed plan and recalls those details later is a conscious person. [Petitioner]'s testimony showed he could carry out a detailed plan and remember it. The jury would know that Dr. Raimo believed [petitioner] was conscious whether or not Dr. Raimo completed his syllogism. Therefore, Dr. Raimo's conclusion did not have "a devastating effect on appellant's defense" as [petitioner] maintains on appeal. Instead, it merely stated what ineluctably flowed from Dr. Raimo's predicate testimony. Although Dr. Raimo may have "stepped over the bounds of permissible testimony," as [petitioner] asserts on appeal, it was an insignificant step, given Dr. Raimo's other testimony, and [petitioner]'s own testimony.

Therefore, trial counsel could rationally conclude an objection would be futile, because it would not change the jury's understanding of the thrust of Dr. Raimo's testimony. At best an objection would have required Dr. Raimo to rephrase his conclusion in terms of hypotheticals. And the jury might well view the objection as obstructionist, which might unduly emphasize Dr. Raimo's opinion. Because trial counsel was not asked why he did not object, and because there was a plausible tactical basis not to object, [petitioner] cannot show incompetence of counsel on direct appeal. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Nor can [petitioner] show prejudice. There is no challenge to Dr. Raimo's testimony, to the effect that a person carrying out a detailed plan and remembering what he did was not conscious. [Petitioner]'s testimony showed he was able to execute a detailed killing plan and recall what he did later. It was not Dr. Raimo's testimony that [petitioner] was conscious that doomed [petitioner],

---

[6] [Petitioner] also asserts the testimony was objectionable because it was outside the scope of proper expert opinion, as provided by Evidence Code section 801. However, this hinges on his claim regarding Penal Code section 29. Because we accept the view that the testimony was objectionable under Penal Code section 29 – at least for purposes of argument – we need not separately analyze Evidence Code section 801.

12

> it was [petitioner]'s testimony about his actions and memory that undermined his claim of unconsciousness.
>
> Finally, the jury was properly instructed on the use of expert testimony, and that it was up to the jury to decide the facts. The jury also was instructed that the People had to prove consciousness beyond a reasonable doubt. We presume the jury followed the instructions. (*People v. Kegler* (1987) 197 Cal.APp.3d 72, 80; *People v. Powell* (1960) 186 Cal.App.2d 54, 59.) Given [petitioner]'s testimony, it is unremarkable that the jury had no doubts about [petitioner]'s consciousness: As the Attorney General correctly observes, "The defense was weak, verging on non-existent."[7] Had trial counsel interposed the objection posited by appellate counsel, the outcome would have been the same.

Opinion (Doc. No. 13, Ex. A) at 10-15.

The clearly established federal law for ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). To succeed on a Strickland claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." Id. at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." Id. at 687–88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Richter, 131 S. Ct. at 787-88. (quoting Strickland, 466 U.S. at 687).

Reviewing courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. See also United States v. Ferreira-Alameda, 815 F.2d 1251 (9th Cir. 1986) ("Review of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation.") This presumption of reasonableness means

---

[7] The prosecutor, with some justification, unsuccessfully sought an in limine hearing to determine whether, given the circumstances, there was enough evidence to tender the unconsciousness defense to the jury.

that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." Cullen v. Pinholster, ___ U.S. ___, 131 S.Ct. 1388, 1407 (2011) (internal quotation marks and alterations omitted).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 131 S. Ct. at 792 (citing Strickland, 466 U.S. at 693). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

Under AEDPA, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Richter, 131 S.Ct. at 785. "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles, 556 U.S. at 123.

Here, petitioner has made no showing that the result of the criminal proceedings against him would have been different had his trial counsel objected to Dr. Raimo's testimony that petition was conscious during the commission of the crime. The state appellate court's well-reasoned determination that petitioner had not shown any cognizable prejudice is entirely congruent with applicable principles of United States Supreme Court precedent and grounded in a reasonable determination of the facts. Therefore, petitioner is not entitled to federal habeas relief with respect to his ineffective assistance of counsel claim.

/////

### B. Error in Jury Instructions

Petitioner's second claim is that the trial court erred in failing to instruct the jury sua sponte that petitioner's oral statements should be viewed with caution. The state appellate court rejected this argument on appeal, stating as follows:

> Peter Reynen testified that about two weeks before the killing, [petitioner] said "hey, I've been doing some cocaine. It's really nice. Hadn't done it in a long time. But I really like it." Peter conceded that he did not report this statement until just before trial began. [Petitioner] testified he had not used cocaine for many years and denied telling Peter he used it recently.
>
> Jackie Webber testified that although she had described the September 25th telephone incident before, until just before trial she had not told anyone that during that incident [petitioner] said "Hetty, I'm going to kill you." [Petitioner] admitted he called Hetty a "lying fucking bitch" and became so angry during that incident that he broke some flower pots and expected the police to be called, and that he scared himself, but inferentially denied the threat.
>
> When there is evidence a defendant made inculpatory out-of-court oral statements, the jury must be instructed to view that evidence with caution, and must be instructed to determine whether the defendant actually made those statements before using evidence of those statements against him. (See *People v. Ford* (1964) 60 Cal.2d 772, 799-800.)
>
> The pattern instruction (CALCRIM No. 358), as requested by the prosecutor, was as follows:
>
>> "You have heard evidence that the defendant made oral or written statements before the trial. You must decide whether or not the defendant made any of these statements in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to such statements.
>>
>> "You must consider with caution evidence of a defendant's oral statement unless it is written or otherwise recorded."
>
> The trial court read the instruction to the jury substantially as requested, but left off the second paragraph. This appears to have been inadvertent.

> [Petitioner] contends the two statements described above – that he used cocaine and said he would kill Hetty – were damaging, and the absence of the last line of the instruction means the jury would give the evidence of those statements undue weight.
>
> We disagree. The main purpose of the instruction is to ensure the jury determines whether inculpatory statements attributed to the [petitioner] *actually were made.* (*People v. Stankewitz* (1990) 51 Cal.3d 72, 94.) The portion of the instruction that was given told the jury that it had to "decide whether or not the defendant made any of those statements in whole or in part." Therefore the jury knew it first had to find that the statements were made. The absence of the part of the instruction advising the jury to view the evidence of such statements *with caution* would have added little.
>
> Defense counsel mentioned both the threat and the cocaine statements briefly in closing argument, to develop his theme that some witnesses had what he characterized as an "agenda" to speak for the victim. The prosecutor briefly mentioned cocaine in rebuttal argument, to show that Dr. Roeder's reports, relied on in part by Dr. Shipko, failed to mention [petitioner]'s valium and cocaine usage. The statements were not central points in any of the arguments. Given [petitioner]'s testimony about how he intended to kill Hetty, planned to kill Hetty, and carried out his plan to kill Hetty, neither statement was significant, and it is not reasonably probable that the jury would have reached a different conclusion had the full instruction been given. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)
>
> [Petitioner] acknowledges that the California Supreme Court has held the *Watson* standard of harmless error applies to this kind of error. (See *People v. Dickey* (2005) 35 Cal.4th 884, 905-907.) [Petitioner] believes a different standard of review should apply, and wants to preserve that question for federal review. We are bound to apply the *Watson* standard of harmless error. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456 (*Auto Equity Sales).)*

(Opinion (Doc. No. 13, Ex. A) at 15-18.)

A challenge to jury instructions does not generally state a federal constitutional claim. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). Habeas corpus is unavailable for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). However, a "claim of error based upon a

16

right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).

In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)). To prevail, petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting conviction violates due process.'" Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). See also Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987). In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)). Further, in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). Finally, where the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

For the reasons explained by the state appellate court and set forth above, the trial court's failure to read the second paragraph of CALCRIM 3.58 to the jury did not "so infect" petitioner's trial as to render his conviction fundamentally unfair. The state court's rejection of

/////

this claim was entirely consistent with applicable principles of United States Supreme Court jurisprudence. Federal habeas relief as to this claim should therefore be denied.

### C. Lying-In-Wait Special Circumstance

Petitioner's third claim for federal habeas relief is based on his contention that California's lying-in-wait special circumstance is unconstitutionally vague because it is not "meaningfully distinct from first degree murder by lying in wait." (Petition (ECF No. 1) at 9.) The state appellate court also rejected this argument on appeal, stating as follows:

> [Petitioner] claims the lying-in-wait special circumstance duplicates the lying-in-wait theory of murder and therefore must be stricken. This claim was raised and rejected several times in the trial court.
>
> [Petitioner] concedes that the California Supreme Court has rejected this claim, and that we are bound by precedent to reject the claim, but he wishes to preserve it for further review in the federal courts.
>
> We agree that the California Supreme Court has rejected this claim, (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148-1149); see also *People v. Lewis* (2008) 43 Cal.4th 415, 515-517; *People v. Stevens* (2007) 41 Cal.4th 182, 203-204; *People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297, 309.) Therefore, we agree we must reject it as well. (*Auto Equity Sales, supra,* 57 Cal.2d at pp. 455-456.)

(Opinion (Doc. No. 13, Ex. A) at 18-19.)

The United States Court of Appeals for the Ninth Circuit has rejected this precise claim. See Bradway v. Cate, 588 F.3d 990, 992-93 (9th Cir. 2009) (holding that the California court's decision that California's lying-in-wait special circumstance sufficiently narrows the class of persons eligible for a sentence of life without parole from other first degree murders committed by lying in wait was neither contrary to nor an unreasonable application of relevant United States Supreme Court jurisprudence). See also Morales v. Woodford, 388 F.3d 1159, 1174 (9th Cir. 2004); Houston v. Roe, 177 F.3d 901, 907-08 (9th Cir. 1999). The decision of the Ninth Circuit in Bradway is binding on this court. Accordingly, petitioner is not entitled to federal habeas relief on this claim.

CONCLUSION

For all of the reasons set forth above, petitioner's application for a writ of habeas corpus should be denied. Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "[t]he district court must issue or a deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, 28 U.S.C. foll. § 2254. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue. Fed. R. App. P. 22(b). For the reasons set forth in these findings and recommendations, petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, no certificate of appealability should issue.

In accordance with the above, IT IS HEREBY ORDERED that the Clerk of the Court is directed to assign this action to a United States District Judge; and

IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be denied; and

2. The district court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The

/////

/////

/////

1 parties are advised that failure to file objections within the specified time may waive the right to
2 appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
3 DATED: September 5, 2013.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

12
will2088.157