1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RICHARD GLEN WILLIAMS,

11            Petitioner,                    No. 2:10-cv-2088 JFM P

12       vs.

13   CALIFORNIA DEPARTMENT OF
     CORRECTIONS,                            ORDER AND
14
              Respondent.                    FINDINGS AND RECOMMENDATIONS
15   _____/

16           Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2007 judgment of

18   conviction entered against him in the Nevada County Superior Court on charges of first degree

19   murder with special circumstances and a weapon enhancement.  Petitioner claims that his

20   constitutional rights were violated by the ineffective assistance provided him by his trial counsel

21   and as a result of jury instruction error at his trial.  Petitioner also claims that the lying-in-wait

22   special circumstance applied in his case is unconstitutionally vague.

23   /////

24   /////

25   /////

26   /////

1

1

FACTS[1]

2

    [Petitioner] admitted that on October 22, 2005, he killed his

3

wife of nearly 30 years, Hendrika "Hetty" Williams.  The defense
was that he acted in a dreamlike, unconscious, state caused by
withdrawal from the drug Paxil.  The People argued the planning

4

and execution of the killing, and [petitioner]'s clear memory of
what he did, showed that he was conscious.

5

6

    A year or two before the events in question [petitioner] tried to
kill himself after Hetty said she wanted a divorce.  He saw a
psychiatrist and was prescribed Paxil, which he took for several

7

months and which he characterized as a lifesaver.

8

    In 2005, Hetty wanted a divorce, but wanted to wait until their
youngest daughter, Briana, finished high school the next year.[2]

9

10

    Hetty met Steven Burns, and became romantically involved
with him after she filed for separation in July.  Hetty moved into
the downstairs unit of the family home, although later she switched

11

with [petitioner] and lived upstairs.

12

    In late July or early August, [petitioner] saw a psychiatrist again
and was again prescribed Paxil.

13

14

    On September 25, Jackie Webber, a longtime family friend who
had helped Hetty move into the downstairs unit, was speaking with
Hetty by telephone and heard [petitioner] begin screaming.

15

[Petitioner] overheard the conversation and learned that Hetty was
seeing Burns, and Webber testified she heard [petitioner] say

16

"Hetty, I'm going to kill you."  However, Webber conceded she
had not reported this threat until just before trial.  Briana testified

17

[petitioner] was screaming and swearing during this incident,
saying "things like 'you fucking bitch' and 'you fucking liar' at my

18

mom."

19

    Hetty obtained a restraining order against [petitioner] at about
this time.

20

    [Petitioner] called Burns and told him not to see Hetty, and

21

complained to Burns' mother and employer about what Burns was
doing.

22

23

24

   [1]   The facts are taken from the opinion of the California Court of Appeal for the Third
Appellate District in <u>People v. Williams</u>, No. C057856 (Nov. 23, 2009), a copy of which is
attached to respondent's answer to the petition (Doc. No. 13, Ex. A), filed January 27, 2011, and

25

is included in the record before this court as Lodged Document No. 1.

26

   [2]   Further unspecified dates are to 2005.

2

1    In October, [petitioner]'s psychiatrist increased his Paxil dosage, but [petitioner] testified he thereafter stopped taking the
2    drug, because he was feeling better.

3    In October, Hetty developed a poison oak rash on her torso and genitals.  [Petitioner] had spread poison oak on her sheets and
4    underwear and told a former neighbor, "he was real tickled about that."  "He was giggling.  He knew it was wrong, but he thought it
5    was just great."  [Petitioner] testified that he did this.  Hetty then moved into a separate house.

6
      On October 17, the night before a family court hearing, Burns
7    stayed over at Hetty's house.  That night, [petitioner] spray painted Burns' truck.  He also searched eBay for stun guns.
8
      [Petitioner] had been planning to go kayaking with Hetty, and
9    he became angry when she cancelled and went to Lake Tahoe with Burns.
10
      On October 21, [petitioner] helped his mother by climbing on
11   her roof to clear her gutters.  Hetty's sister-in-law, Ena Heynen, spoke on the telephone with [petitioner] that day and he generally
12   sounded upbeat, "jovial, if not euphoric," but there was "hidden darkness" in the call and when he described using poison oak on
13   Hetty, he thought it was funny, and spoke in a sadistic tone. [Petitioner] admitted that he was pleased when he described this
14   event.

15    On the night of October 21, [petitioner] bought a stun gun on
      the Internet, although he testified he did not complete the last step
16   necessary for the purchase.  [Petitioner] slept badly that night and felt that he wanted to kill Hetty.  He went to the garage and took
17   the washers off some of the nails for his nail gun, cut up a towel to use as a ligature and told his dog that he was going to kill Hetty
18   and himself.  He testified he felt manic and was on "auto pilot."

19    When Hetty and Burns returned from Lake Tahoe, Burns spent
      that night (October 21) with her.  Hetty was going to see
20   [petitioner] the next day to discuss property issues, did not fear [petitioner], and declined Burns' offer to accompany her.  When
21   Burns left Hetty's house the next morning, he found a nail in one of his tires.  [Petitioner] denied putting a nail in Burns' tire.
22
      Briana, who had been away on a trip, called [petitioner] because
23   he was supposed to pick her up that morning (October 22), but he told her he had arranged for her grandparents to do so.
24
      Before Hetty arrived that morning, [petitioner] wrote a
25   purported suicide note on his computer, and even corrected minor typographical errors.  The note begins:  "Dear Friends & family – I
26   love you all so much – I cannot take the fact that my dear Hetty has

1   chosen to have an [adulterous] secret affair behind my back.  I
    found out the hard way and was blamed for finding out."  Later, it
2   says: "Steve Burns will have blood on his hands for this for some
    time.  Jackie Webber will [too], for coaching Hetty away from me
3   and helping to hide all of it."  Still later it says "I must go with my
    dear Hetty, to be [cremated] together as planned and spread in the
4   Bear [V]alley off Highway 20.  All my possessions are to be
    divided among my family, with Jon administering my tools."  He
5   also expresses love for his family, including Peter and Ena Reynen,
    and hoping his daughters will forgive him.  In part [petitioner]
6   states "I am of sound mind and body[.]"

7       [Petitioner] then disconnected all of the telephones and locked
    up the house.

8
        Although [petitioner] testified he bought his nail gun a couple
9   of months before, there was evidence he bought it days before.  In
    any event, the gun uses .22 caliber blank cartridges to fire hardened
10  nails into concrete.  It must be manually reloaded for each shot,
    with the muzzle pressed down hard–with 35 pounds of pressure–to
11  release a safety lock.  The nails come with square collars or
    washers to prevent them from penetrating completely into the
12  concrete.  As stated, [petitioner] removed the washers from a
    number of nails, allowing them to penetrate further.  [Petitioner]
13  testified he did this in the garage and that he wanted to kill Hetty.

14      [Petitioner] testified he placed the nail gun in the bedroom,
    placed the towel in his pocket, locked the doors, wrote the suicide
15  note, and killed Hetty, all while feeling "directed" by another
    person.  He attacked Hetty by surprise, strangling her in the
16  hallway for 30-40 second, then closed her nose for 15-20 seconds
    when she was on the floor.  Then he got the nail gun and shot her
17  in the head.  He reloaded and shot her in the head again, then
    carried her to the bedroom, reloaded and shot her in the chest.  He
18  then shot himself in the chest, twice, tried to shoot himself in the
    head, then plugged in a telephone and called 911.  He did not feel
19  the nails in his chest.

20      The 911 call was received at 10:11 that morning.  [Petitioner]
    calmly told the dispatcher, "There's been a shooting at 10655 Alta
21  Street", and to come quickly.

22      Peace officers had to force their way in.  They found [petitioner]
    and Hetty on the bed, with a nail gun by Hetty's hand.  Hetty died
23  at the hospital, and [petitioner] was in the hospital for just over a
    month.

24
        Dr. Henrikson, the pathologist, described the tracks of the nails
25  and the strangulation marks on Hetty's neck.

26  /////

4

1   [Petitioner] admitted that while he was in jail, he learned about the so-called "Paxil withdrawal" defense and received some
2   written materials about it.

3   [Petitioner]'s mental expert, Dr. Stuart Shipko, is a psychiatrist with expertise in anxiety disorders and the effects of Paxil, an
4   antidepressant, mood-altering drug of the selected serotonin reuptake inhibitor (SSRI) class, and he maintains a website about
5   Paxil.  Dr. Shipko formed his opinions in this case by reading police reports,  reports by [petitioner]'s psychiatrist and Dr.
6   Roeder, a psychologist, and by reading a transcript of [petitioner]'s initial trial testimony, but he had never met [petitioner].  Based on
7   this material and his experience, Dr. Shipko testified the killing was "typical of Paxil induced violence."  His record review showed
8   that [petitioner] began taking Paxil on August 4, reduced the dosage on September 7, increased the dosage to 20 milligrams, a
9   fairly high dose, on October 5, then [petitioner] stopped taking the drug around October 10-14.  The fact [petitioner]'s dosage was
10  increased, causing him to feel better, and then abruptly stopped, was "a very disastrous event," and the killing occurred at the "peak
11  of the withdrawal delirium[.]"

12  Dr. Shipko testified [petitioner]'s behavior after the increased dosage on October 5 – such as using poison ivy against Hetty and
13  spray painting Burns' truck – was "suggestive" of mania.  He described four mechanisms that can be caused by Paxil that equate
14  to unconsciousness:  Akathisia, or extreme restlessness, emotional blunting, delirium, and a serious sleep disorder.  Another drug
15  [petitioner] took, Trazodone, might have increased these effects.

16  On cross examination, Dr. Shipko conceded that goal-directed actions, such as searching the internet for weapons, modifying the
17  nails and drafting the suicide note, and clear subsequent memory were inconsistent with delirium.  However, he testified [petitioner]
18  may have filled in his memory gaps with after-acquired information.  He conceded that [petitioner] had received written
19  materials on the "Paxil withdrawal" defense before he was seen by Dr. Roeder.  And Dr. Shipko admitted he could not *diagnose* a
20  patient without seeing him.  But Dr. Shipko still maintained that without Paxil, the killing would not have happened.

21
22  [Petitioner] then resumed his testimony.  He recalled working on the nails, tearing the towel, the details of the killing and that he
    intended to kill Hetty.  He was "numb" and "pretty flat" when he
23  drafted the suicide note, but remembered making coffee that morning.  He intended to kill Hetty and himself, but did not know
24  why, ". . . I was almost directed."  He did not know why he put the

25  /////

26  /////

5

nail gun by Hetty's hand.[3] [Petitioner] claimed that at some point he became very agitated while driving and although he attributed this to Paxil, he was vague about the dates his dosage changed and then stopped.

In rebuttal, the prosecution called Dr. Eric Raimo, another psychiatrist. Although he reviewed the same records that Dr. Shipko reviewed, Dr. Raimo also observed [petitioner]'s testimony in court, as well as Dr. Shipko's testimony. In his view, it was essential to interview a patient to rule out malingering. He testified Paxil does not cause unconsciousness. Further, a person who is unconscious does not remember details of what he did, and is incapable of step-by-step planning. None of the four diagnoses posited by Dr. Shipko were supported by the materials Dr. Raimo reviewed: Two-akathisia and emotional blunting – are not forms of unconsciousness, and although delirium and severe sleep disorder can be forms of unconsciousness, they would not permit step-by-step planning. Mania can be goal-directed, but there was no sign of mania in the documentation or testimony Dr. Raimo reviewed. [Petitioner]'s clear memory of events negated unconsciousness. Because [petitioner] took Paxil successfully in 2004, it was unlikely he would have a severe reaction to it in the future. Paxil played no role in the killing and [petitioner] was conscious.

Opinion (Doc. No. 13, Ex. A) at 2-10.

ANALYSIS

I. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

/////

---

[3] The Attorney General states [petitioner] told a peace officer in the hospital that Hetty shot him. Such testimony was given outside the presence of the jury, and the trial court later excluded it from evidence.

6

1  Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal

2  habeas corpus relief:

3  An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court shall not

4  be granted with respect to any claim that was adjudicated on the
merits in State court proceedings unless the adjudication of the claim-

5

6  (1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

7

8  (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.

9

10  For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

11  holdings of the United States Supreme Court at the time of the state court decision.  Stanley v.

12  Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

13  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly

14  established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859

15  (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).

16  A state court decision is "contrary to" clearly established federal law if it applies a

17  rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

18  precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003); Early

19  v. Packer, 537 U.S. 3, 7 (2002).  Under the "unreasonable application" clause of § 2254(d)(1), a

20  federal habeas court may grant the writ if the state court identifies the correct governing legal

21  principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts

22  of the prisoner's case.[4]  Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413;

23  Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not

24  _____

25  [4] Under § 2254(d)(2), a state court decision based on a factual determination is not to be
overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

26  384 F.3d 628, 638 (9th Cir. 2004)).

1   issue the writ simply because that court concludes in its independent judgment that the relevant state-

2   court decision applied clearly established federal law erroneously or incorrectly.   Rather, that

3   application must also be unreasonable." Williams, 529 U.S. at 412.  See also Schriro v. Landrigan,

4   550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in

5   its independent review of the legal question, is left with a 'firm conviction' that the state court was

6   'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief

7   so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

8   Harrington v. Richter, 562 U.S.___, ___,131 S. Ct. 770, 786 (2011) (quoting Yarborough v.

9   Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus

10  from a federal court, a state prisoner must show that the state court's ruling on the claim being

11  presented in federal court was so lacking in justification that there was an error well understood and

12  comprehended in existing law beyond any possibility for fairminded disagreement." Richter,131 S.

13  Ct. at 786-87.

14          If the state court's decision does not meet the criteria set forth in § 2254(d), a

15  reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v.

16  Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.

17  2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

18  2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

19  de novo the constitutional issues raised.").

20          The court looks to the last reasoned state court decision as the basis for the state court

21  judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004);

22  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If the last reasoned state court decision adopts

23  or substantially incorporates the reasoning from a previous state court decision, this court may

24  consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475

25  F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a federal claim has been presented to a state court

26  and the state court has denied relief, it may be presumed that the state court adjudicated the claim

1  on the merits in the absence of any indication or state-law procedural principles to the contrary."

2  Richter, 131 S. Ct. at 784-85.  This presumption may be overcome by a showing "there is reason to

3  think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v.

4  Nunnemaker, 501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on a petitioner's

5  claims rejects some claims but does not expressly address a federal claim, a federal habeas court

6  must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v.

7  Williams, ___ U.S. ___, ___, 133 S. Ct. 1088, 1091 (2013).

8          Where the state court reaches a decision on the merits but provides no reasoning to

9  support its conclusion, a federal habeas court independently reviews the record to determine whether

10  habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson,

11  336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the

12  constitutional issue, but rather, the only method by which we can determine whether a silent state

13  court decision is objectively unreasonable." Himes, 336 F.3d at 853.  Where no reasoned decision

14  is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for

15  the state court to deny relief."  Richter, 131 S. Ct. at 784.

16          When it is clear, however, that a state court has not reached the merits of a

17  petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a

18  federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino,

19  462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

20  II.  Petitioner's Claims

21      A.  Ineffective Assistance of Counsel

22          Petitioner's first claim is that he received ineffective assistance of counsel when

23  his trial attorney failed to object to trial testimony by the prosecution's expert witness that

24  petitioner was conscious during the commission of the crime.  Petitioner contends that the expert

25  "had no knowledge" and that this testimony "undermined" petitioner's main defense theory.

26  (Petition filed Aug. 5, 2010 (ECF No. 1) at 5.)  The last reasoned state court decision rejecting

1   this argument is the decision of the California Court of Appeal for the Third Appellate District on

2   petitioner's direct appeal.  In rejecting petitioner's argument the state appellate court stated as

3   follows:

4           A person who is unconscious by reason of involuntary
        intoxication – that is, not aware of what he or she is doing – has
5       not committed a crime.  (Pen. Code, § 25, subd. Four; see *People v.*
        *Chaffey* (1994) 25 Cal.App.4th 852, 855-856.)  [Petitioner]'s
6       theory was that he could not have anticipated the withdrawal
        reaction of abruptly stopping his Paxil medication, and he killed
7       Hetty while unconscious due to that involuntary reaction.

8           [Petitioner] contends that his trial attorney was incompetent
        because he failed to object to Dr. Raimo's testimony that
9       [petitioner] was conscious when he killed Hetty.  We conclude that
        although a tenable objection might have been made, it would not
10      have diminished the thrust of Dr. Raimo's testimony and would
        merely have required him to rephrase his opinion in terms of a
11      hypothetical.  For this reason, trial counsel may have made a
        rational tactical decision to refrain from objecting, and the lack of
12      an objection did not cause prejudice.

13          The rules governing [petitioner]'s claim are as follows:

14              """[I]n order to demonstrate ineffective
            assistance of counsel, a defendant must first show
15          counsel's performance was 'deficient' because his
            'representation fell below an objective standard of
16          reasonableness . . . under prevailing professional
            norms.'  [Citations.]  Second, he must also show
17          prejudice flowing from counsel's performance or
            lack thereof.'"  [Citation.]

18
                "'[T]he mere failure to object rarely rises to a
19          level implicating one's constitutional right to
            effective legal counsel.'  [Citation.]  If, as here, the
20          record fails to show why counsel failed to object,
            the claim of ineffective assistance must be rejected
21          on appeal unless counsel was asked for an
            explanation and failed to provide one or there can
22          be no satisfactory explanation.  [Citation]  'A
            reviewing court will not second-guess trial
23          counsel's reasonable tactical decisions.'"  (*People v.*
            *Mitchell* (2008) 164 Cal.App.4th 442, 466-467.)

24
                Generally, a person's intent is shown by his or her actions:
25          "'[C]ourts and juries every day pass upon knowledge, belief and
            intent – the state of men's minds – having before them no more
26          than evidence of their words and conduct, from which, in ordinary

10

human experience, mental condition may be inferred.'" (*United States v. Williams* (2008) 553 U.S. __, __ [170 L.Ed.2d 650, 671]; see *People v. Johnson* (1901) 131 Cal. 511, 514.) "The intent or intention is manifested by the circumstances connected with the offense." (Pen. Code, § 21, subd. (a).)

In the *unchallenged* portions of Dr. Raimo's testimony, Dr. Raimo gave the opinion that a person who executes step-by-step planning and has a clear memory of events is a conscious person.

[Petitioner]'s testimony shows that, in advance of the killing, [petitioner] knew he intended to kill Hetty, and was able to alter the nail-gun nails for deeper penetration, tear a towel into a ligature, lock the doors, unplug the telephones, and draft and make minor changes to a suicide note that explained his jealous motivation for killing Hetty, and made clear testamentary provisions. When Hetty arrived, he was able to surprise her, strangle her, shoot her with a nail gun three times – having to reload each time – then shoot himself with the gun two times, then plug in a telephone and speak to a 911 operator.

What [petitioner] challenges on appeal is Dr. Raimo's testimony about his conclusion: *Because* a person who can implement and recall a detailed plan is a conscious person, and *because* [petitioner] was able to implement and recall a detailed plan, *therefore* defendant was conscious when he killed Hetty.[5]

On appeal, [petitioner] contends that trial counsel should have objected to this testimony. We assume for purposes of this appeal that a tenable objection could have been made. An expert may not testify "as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (Pen. Code, § 29; see *People v. Smithey* (1999) 20 Cal.4th 936, 960-961.) Although the Attorney General appears to contest the point, we assume for purposes of this appeal that consciousness is a "mental state" as that term is used in Penal Code section 20. (See *People v. Boyes* (1983) 149 Cal.App.3d 812, 819-821

---

[5]   In particular, Dr. Raimo testified that, in his opinion, "Mr. Williams was not unconscious the night of the murder, save for as he testified the two hours he was asleep . . . . So with regard to the actual act, acts that led up to the killing and the like, it in my opinion was a fully conscious act. And Paxil had no effect on consciousness in this regard." He later testified: "I believe he was fully conscious, aware, actually reported that he wanted to kill his wife. Even though he didn't know why, he actually remembered that he wanted to do it. And in my opinion that's consistent with being conscious, awake, alert. He dated the suicide note. Wrote his name down on it. He's alert to person, time, made phone calls, told his parents to go pick up his daughter and the like."

[although consciousness is not an element of a crime, "it is pertinent both to the voluntariness of a defendant's acts and to his capacity to understand and intend those acts and their consequences"]; *Jackson v. Calderon* (9th Cir. 2000) 211 F.3d 1148, 1156-1160 [suggesting trial counsel could rationally conclude Penal Code section 29 would bar direct testimony about unconsciousness].)[6]

But the fact a good objection is available does not mean it is incompetent to refrain from interposing it. (See generally, *People v. Eckstrom* (1974) 43 Cal.App.3d 996, 1000-1003.)

As explained above, Dr. Raimo gave his opinion that a person who carried out a detailed plan and recalls those details later is a conscious person. [Petitioner]'s testimony showed he could carry out a detailed plan and remember it. The jury would know that Dr. Raimo believed [petitioner] was conscious whether or not Dr. Raimo completed his syllogism. Therefore, Dr. Raimo's conclusion did not have "a devastating effect on appellant's defense" as [petitioner] maintains on appeal. Instead, it merely stated what ineluctably flowed from Dr. Raimo's predicate testimony. Although Dr. Raimo may have "stepped over the bounds of permissible testimony," as [petitioner] asserts on appeal, it was an insignificant step, given Dr. Raimo's other testimony, and [petitioner]'s own testimony.

Therefore, trial counsel could rationally conclude an objection would be futile, because it would not change the jury's understanding of the thrust of Dr. Raimo's testimony. At best an objection would have required Dr. Raimo to rephrase his conclusion in terms of hypotheticals. And the jury might well view the objection as obstructionist, which might unduly emphasize Dr. Raimo's opinion. Because trial counsel was not asked why he did not object, and because there was a plausible tactical basis not to object, [petitioner] cannot show incompetence of counsel on direct appeal. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Nor can [petitioner] show prejudice. There is no challenge to Dr. Raimo's testimony, to the effect that a person carrying out a detailed plan and remembering what he did was not conscious. [Petitioner]'s testimony showed he was able to execute a detailed killing plan and recall what he did later. It was not Dr. Raimo's testimony that [petitioner] was conscious that doomed [petitioner],

---

[6] [Petitioner] also asserts the testimony was objectionable because it was outside the scope of proper expert opinion, as provided by Evidence Code section 801. However, this hinges on his claim regarding Penal Code section 29. Because we accept the view that the testimony was objectionable under Penal Code section 29 – at least for purposes of argument – we need not separately analyze Evidence Code section 801.

1   it was [petitioner]'s testimony about his actions and memory that
    undermined his claim of unconsciousness.

2

3           Finally, the jury was properly instructed on the use of expert
    testimony, and that it was up to the jury to decide the facts.  The
    jury also was instructed that the People had to prove consciousness

4   beyond a reasonable doubt.  We presume the jury followed the
    instructions.  (*People v. Kegler* (1987) 197 Cal.APp.3d 72, 80;

5   *People v. Powell* (1960) 186 Cal.App.2d 54, 59.)  Given
    [petitioner]'s testimony, it is unremarkable that the jury had no

6   doubts about [petitioner]'s consciousness:  As the Attorney
    General correctly observes, "The defense was weak, verging on

7   non-existent."[7]  Had trial counsel interposed the objection posited
    by appellate counsel, the outcome would have been the same.

8

9   Opinion (Doc. No. 13, Ex. A) at 10-15.

10          The clearly established federal law for ineffective assistance of counsel claims is

11  Strickland v. Washington, 466 U.S. 668 (1984).  To succeed on a Strickland claim, a defendant

12  must show that (1) his counsel's performance was deficient and that (2) the "deficient

13  performance prejudiced the defense."  Id. at 687.  Counsel is constitutionally deficient if his or

14  her representation "fell below an objective standard of reasonableness" such that it was outside

15  "the range of competence demanded of attorneys in criminal cases."  Id. at 687–88 (internal

16  quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a

17  fair trial, a trial whose result is reliable.'"  Richter, 131 S. Ct. at 787-88. (quoting Strickland, 466

18  U.S. at 687).

19          Reviewing courts must "indulge a strong presumption that counsel's conduct falls

20  within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  See

21  also United States v. Ferreira-Alameda, 815 F.2d 1251 (9th Cir. 1986) ("Review of counsel's

22  performance is highly deferential and there is a strong presumption that counsel's conduct fell

23  within the wide range of reasonable representation.")  This presumption of reasonableness means

24

25          [7]  The prosecutor, with some justification, unsuccessfully sought an in limine hearing to
    determine whether, given the circumstances, there was enough evidence to tender the
26  unconsciousness defense to the jury.

1    that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively

2    entertain the range of possible reasons [defense] counsel may have had for proceeding as they

3    did." Cullen v. Pinholster, ___ U.S. ___, 131 S.Ct. 1388, 1407 (2011) (internal quotation marks

4    and alterations omitted).

5           Prejudice is found where "there is a reasonable probability that, but for counsel's

6    unprofessional errors, the result of the proceeding would have been different." Strickland, 466

7    U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the

8    outcome." Id. "The likelihood of a different result must be substantial, not just conceivable."

9    Richter, 131 S. Ct. at 792 (citing Strickland, 466 U.S. at 693). A reviewing court "need not

10   determine whether counsel's performance was deficient before examining the prejudice suffered

11   by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an

12   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

13   followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

14   697).

15          Under AEDPA, "[t]he pivotal question is whether the state court's application of

16   the Strickland standard was unreasonable." Richter, 131 S.Ct. at 785. "[B]ecause the Strickland

17   standard is a general standard, a state court has even more latitude to reasonably determine that a

18   defendant has not satisfied that standard." Knowles, 556 U.S. at 123.

19          Here, petitioner has made no showing that the result of the criminal proceedings

20   against him would have been different had his trial counsel objected to Dr. Raimo's testimony

21   that petition was conscious during the commission of the crime.  The state appellate court's well-

22   reasoned determination that petitioner had not shown any cognizable prejudice is entirely

23   congruent with applicable principles of United States Supreme Court precedent and grounded in

24   a reasonable determination of the facts.  Therefore, petitioner is not entitled to federal habeas

25   relief with respect to his ineffective assistance of counsel claim.

26   /////

14

1          B.  Error in Jury Instructions

2          Petitioner's second claim is that the trial court erred in failing to instruct the jury

3   sua sponte that petitioner's oral statements should be viewed with caution.  The state appellate

4   court rejected this argument on appeal, stating as follows:

5          Peter Reynen testified that about two weeks before the killing,
           [petitioner] said "hey, I've been  doing some cocaine.  It's really
6          nice.  Hadn't done it in a long time.  But I really like it."  Peter
           conceded that he did not report this statement until just before trial
7          began.  [Petitioner] testified he had not used cocaine for many
           years and denied telling Peter he used it recently.
8
           Jackie Webber testified that although she had described the
9          September 25th telephone incident before, until just before trial she
           had not told anyone that during that incident [petitioner] said
10         "Hetty, I'm going to kill you."  [Petitioner] admitted he called
           Hetty a "lying fucking bitch" and became so angry during that
11         incident that he broke some flower pots and expected the police to
           be called, and that he scared himself, but inferentially denied the
12         threat.

13         When there is evidence a defendant made inculpatory out-of-
           court oral statements, the jury must be instructed to view that
14         evidence with caution, and must be instructed to determine
           whether the defendant actually made those statements before using
15         evidence of those statements against him.  (See *People v. Ford*
           (1964) 60 Cal.2d 772, 799-800.)
16
           The pattern instruction (CALCRIM No. 358), as requested by
17         the prosecutor, was as follows:

18             "You have heard evidence that the defendant
               made oral or written statements before the trial.
19             You must decide whether or not the defendant made
               any of these statements in whole or in part.  If you
20             decide that the defendant made such statements,
               consider the statements, along with all the other
21             evidence, in reaching your verdict.  It is up to you to
               decide how much importance to give to such
22             statements.

23             "You must consider with caution evidence of a
               defendant's oral statement unless it is written or
24             otherwise recorded."

25         The trial court read the instruction to the jury substantially as
           requested, but left off the second paragraph.  This appears to have
26         been inadvertent.

15

1       [Petitioner] contends the two statements described above – that
        he used cocaine and said he would kill Hetty – were damaging, and
2       the absence of the last line of the instruction means the jury would
        give the evidence of those statements undue weight.
3
            We disagree.  The main purpose of the instruction is to ensure
4       the jury determines whether inculpatory statements attributed to the
        [petitioner] *actually were made.* (*People v. Stankewitz* (1990) 51
5       Cal.3d 72, 94.)  The portion of the instruction that was given told
        the jury that it had to "decide whether or not the defendant made
6       any of those statements in whole or in part."  Therefore the jury
        knew it first had to find that the statements were made.  The
7       absence of the part of the instruction advising the jury to view the
        evidence of such statements *with caution* would have added little.
8
            Defense counsel mentioned both the threat and the cocaine
9       statements briefly in closing argument, to develop his theme that
        some witnesses had what he characterized as an "agenda" to speak
10      for the victim.  The prosecutor briefly mentioned cocaine in
        rebuttal argument, to show that Dr. Roeder's reports, relied on in
11      part by Dr. Shipko, failed to mention [petitioner]'s valium and
        cocaine usage.  The statements were not central points in any of the
12      arguments.  Given [petitioner]'s testimony about how he intended
        to kill Hetty, planned to kill Hetty, and carried out his plan to kill
13      Hetty, neither statement was significant, and it is not reasonably
        probable that the jury would have reached a different conclusion
14      had the full instruction been given. (*People v. Watson* (1956) 46
        Cal.2d 818, 836 (*Watson*).)
15
            [Petitioner] acknowledges that the California Supreme Court
16      has held the *Watson* standard of harmless error applies to this kind
        of error.  (See *People v. Dickey* (2005) 35 Cal.4th 884, 905-907.)
17      [Petitioner] believes a different standard of review should apply,
        and wants to preserve that question for federal review.  We are
18      bound to apply the *Watson* standard of harmless error. (*Auto
        Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456
19      (*Auto Equity Sales*).)

20   (Opinion (Doc. No. 13, Ex. A) at 15-18.)

21       A challenge to jury instructions does not generally state a federal constitutional

22   claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456

23   U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus

24   is unavailable for alleged error in the interpretation or application of state law.  Middleton, 768

25   F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v.

26   Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  However, a "claim of error based upon a

                                            16

1   right not specifically guaranteed by the Constitution may nonetheless form a ground for federal

2   habeas corpus relief where its impact so infects the entire trial that the resulting conviction

3   violates the defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir.

4   1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314

5   U.S. 219, 236 (1941).

6             In order to warrant federal habeas relief, a challenged jury instruction "cannot be

7   merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

8   process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

9   (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

10  must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

11  conviction violates due process.'"  Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147).  See

12  also Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987).  In making its determination, this

13  court must evaluate the challenged jury instructions "'in the context of the overall charge to the

14  jury as a component of the entire trial process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v.

15  Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Further, in reviewing an allegedly ambiguous

16  instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has

17  applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at

18  72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  Finally, where the challenge is to a

19  refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because

20  "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement

21  of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte v. Stewart, 111

22  F.3d 616, 624 (9th Cir. 1997).

23             For the reasons explained by the state appellate court and set forth above, the trial

24  court's failure to read the second paragraph of CALCRIM 3.58 to the jury did not "so infect"

25  petitioner's trial as to render his conviction fundamentally unfair.  The state court's rejection of

26  /////

17

1    this claim was entirely consistent with applicable principles of United States Supreme Court

2    jurisprudence.  Federal habeas relief as to this claim should therefore be denied.

3                          C.  Lying-In-Wait Special Circumstance

4                  Petitioner's third claim for federal habeas relief is based on his contention that

5    California's lying-in-wait special circumstance is unconstitutionally vague because it is not

6    "meaningfully distinct from first degree murder by lying in wait."  (Petition (ECF No. 1) at 9.)

7    The state appellate court also rejected this argument on appeal, stating as follows:

8                  [Petitioner] claims the lying-in-wait special circumstance
                   duplicates the lying-in-wait theory of murder and therefore must be
9                  stricken.  This claim was raised and rejected several times in the
                   trial court.
10
                   [Petitioner] concedes that the California Supreme Court has
11                 rejected this claim, and that we are bound by precedent to reject the
                   claim, but he wishes to preserve it for further review in the federal
12                 courts.

13                  We agree that the California Supreme Court has rejected this
                   claim, (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148-1149);
14                 see also *People v. Lewis* (2008) 43 Cal.4th 415, 515-517; *People v.
                   Stevens* (2007) 41 Cal.4th 182, 203-204; *People v. Superior Court
15                 (Bradway)* (2003) 105 Cal.App.4th 297, 309.)  Therefore, we agree
                   we must reject it as well.  (*Auto Equity Sales, supra,* 57 Cal.2d at
16                 pp. 455-456.)

17   (Opinion (Doc. No. 13, Ex. A) at 18-19.)

18                  The United States Court of Appeals for the Ninth Circuit has rejected this precise

19   claim.  See Bradway v. Cate, 588 F.3d 990, 992-93 (9th Cir. 2009) (holding that the California

20   court's decision that California's lying-in-wait special circumstance sufficiently narrows the class

21   of persons eligible for a sentence of life without parole from other first degree murders

22   committed by lying in wait was neither contrary to nor an unreasonable application of relevant

23   United States Supreme Court jurisprudence).  See also Morales v. Woodford, 388 F.3d 1159,

24   1174 (9th Cir. 2004); Houston v. Roe, 177 F.3d 901, 907-08 (9th Cir. 1999).  The decision of the

25   Ninth Circuit in Bradway is binding on this court.  Accordingly, petitioner is not entitled to

26   federal habeas relief on this claim.

CONCLUSION

For all of the reasons set forth above, petitioner's application for a writ of habeas corpus should be denied.  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "[t]he district court must issue or a deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b). For the reasons set forth in these findings and recommendations, petitioner has not made a substantial showing of the denial of a constitutional right.  Accordingly, no certificate of appealability should issue.

In accordance with the above, IT IS HEREBY ORDERED that the Clerk of the Court is directed to assign this action to a United States District Judge; and

IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be denied; and

2. The district court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The

/////

/////

/////

1    parties are advised that failure to file objections within the specified time may waive the right to

2    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3    DATED: September 5, 2013.

4

5    _____

6    DALE A. DROZD
     UNITED STATES MAGISTRATE JUDGE

7    12

     will2088.157

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26